**THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN.  THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FRANCIS' DRILLING FLUIDS, LTD., *et al.,* | § | Case No. 18-35441 |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

## COMBINED DISCLOSURE STATEMENT AND
## JOINT PLAN OF LIQUIDATION FOR FRANCIS' DRILLING FLUIDS, LTD., *ET AL.*

**COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION FOR FRANCIS' DRILLING FLUIDS, LTD., *ET AL.* HAS BEEN SET FOR A FINAL HEARING ON APPROVAL OF THE DISCLOSURE STATEMENT AND A HEARING ON CONFIRMATION OF THE PLAN OF LIQUIDATION ON JUNE [●], 2019 AT [__:__] [_].M. (CENTRAL), IN COURTROOM 404, UNITED STATES COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002.**

**THE PLAN PROPONENTS, WHICH INCLUDE THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO <u>ACCEPT</u> THE PLAN AS CONTAINED HEREIN.**

**May [●], 2019.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are, as follows:  Francis' Drilling Fluids, Ltd. (0574); FDF Resources Holdings LLC (1956); Francis Logistics LLC (9397).  Additional information regarding these cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases-cr.stretto.com/francisdrilling.

**THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN.  THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME**

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION ...................................................................................................... | 1 |
| II. | THE SOLICITATION ................................................................................................ | 1 |
| III. | DEFINITIONS AND, RULES OF INTERPRETATION ............................................. | 2 |
| | A. | DEFINITIONS .................................................................................................... | 2 |
| | B. | RULES OF INTERPRETATION ........................................................................ | 8 |
| | C. | INCORPORATION OF DOCUMENTS BY REFERENCE .............................. | 8 |
| IV. | DEBTORS' HISTORY, ASSETS, LIABILITIES,  AND MAJOR EVENTS ................... | 9 |
| | 1. | Incorporation and Ownership Structure ............................................................ | 9 |
| | 2. | Management ...................................................................................................... | 9 |
| | 3. | Products and Services ...................................................................................... | 10 |
| | 4. | Assets and Liabilities of the Debtors as of the Petition Date .......................... | 10 |
| | 5. | Events Leading to the Debtors' Bankruptcy Filing. ........................................ | 11 |
| V. | MAIN EVENTS IN THE BANKRUPTCY CASES ................................................... | 12 |
| | A. | CLAIMS BAR DATE .......................................................................................... | 12 |
| | B. | MEETING OF CREDITORS .............................................................................. | 12 |
| | C. | RETENTION OF PROFESSIONALS ................................................................. | 12 |
| | D. | CERTAIN ORDERS AND EVENTS IN THE BANKRUPTCY CASE ............. | 13 |
| | E. | SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS AND ASSUMPTION OF CERTAIN CLAIMS AND LIABILITIES ............................ | 14 |
| VI. | UNCLASSIFIED CLAIMS ....................................................................................... | 16 |
| | A. | ADMINISTRATIVE CLAIMS ........................................................................... | 16 |
| VII. | CLASSIFICATION AND TREATMENT  OF CLAIMS AND INTERESTS ................. | 18 |
| | A. | CLASS 1 - ALLOWED PRIORITY NON-TAX CLAIMS .................................. | 18 |
| | B. | CLASS 2 – ALLOWED SECURED CLAIMS ..................................................... | 18 |
| | C. | CLASS 3 – ALLOWED UNASSUMED GENERAL UNSECURED CLAIMS ............................................................................................................... | 19 |
| | D. | CLASS 4 – ALLOWED DEFICIENCY CLAIMS OF THE FIRST LIEN SECURED PARTIES AND THE SUBORDINATED LENDER ........................... | 20 |
| | E. | CLASS 5 – ALLOWED INTERESTS OF THE DEBTORS ................................. | 21 |
| | F. | CLASS 6 –LIABILITIES ASSUMED UNDER THE FDF ENERGY SERVICES APA ................................................................................................. | 21 |
| VIII. | MEANS FOR EXECUTION OF THE PLAN ............................................................. | 21 |
| | A. | FUNDING THE PLAN ........................................................................................ | 21 |
| | B. | CLAIMS RESERVE ........................................................................................... | 21 |
| | C. | SUBSTANTIVE CONSOLIDATION OF THE DEBTORS ............................... | 21 |
| | D. | APPOINTMENT OF THE PLAN AGENT ......................................................... | 22 |
| | | 1. | Appointment Of The Plan Agent. .......................................... 22 |
| | | 2. | Powers And Duties Of The Plan Agent. ................................ 22 |
| | | 3. | Release. ................................................................................. 23 |
| | | 4. | Monitoring, Auditing And Bonding. ..................................... 23 |

THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED
TO VOTE ON THE PLAN.  THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS
PLAN AT THIS TIME

|  |  | 5. | Compensation Of The Plan Agent And Retention Of Professionals. ........23 |
|  |  | 6. | Resignation. ............................................................................................24 |
|  |  | 7. | Reporting Duties. ....................................................................................24 |
|  |  | 8. | Termination..............................................................................................24 |
|  |  | 9. | The Committee.........................................................................................24 |
|  | E. | DISALLOWANCE OF LIABILITIES ASSUMED PURSUANT TO THE FDF ENERGY SERVICES APA ............................................................25 |
|  | F. | CORPORATE NAME CHANGE AND DISSOLUTION OF THE DEBTORS ...................................................................................................25 |
|  | G. | RESIGNATION OF OFFICERS AND DIRECTORS ...........................25 |
| IX. | QUARTERLY FEES, RESERVES AND DISTRIBUTIONS ..........................................25 |
|  | A. | PAYMENT OF POST-CONFIRMATION QUARTERLY FEES......................25 |
|  | B. | PROVISIONS GOVERNING DISTRIBUTIONS ...............................................25 |
|  | C. | PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS AGAINST THE DEBTORS ...........................26 |
| X. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .........................................27 |
|  | A. | ENTRY OF CONFIRMATION ORDER................................................................27 |
|  | B. | FINALITY OF CONFIRMATION ORDER; WAIVER.....................................27 |
|  | C. | THE CLAIMS RESERVE.........................................................................................28 |
| XI. | PRESERVATION OF RETAINED CLAIMS AND VESTING .....................................28 |
| XII. | TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED LEASES .........28 |
| XIII. | MODIFICATIONS AND AMENDMENTS ......................................................................29 |
| XIV. | RETENTION OF JURISDICTION ...................................................................................29 |
| XV. | EFFECTS OF CONFIRMATION ......................................................................................30 |
|  | A. | BINDING EFFECT .....................................................................................................30 |
|  | B. | RELEASES BY HOLDERS OF CLAIMS AND INTERESTS............................31 |
|  | C. | EXCULPATION AND LIMITATION OF LIABILITY .....................................31 |
|  | D. | LIMITED DISCHARGE OF DEBTORS AND INJUNCTION ...........................32 |
|  | E. | COMPROMISE AND SETTLEMENT......................................................................32 |
| XVI. | MISCELLANEOUS PROVISIONS...................................................................................32 |
| XVII. | CONFIRMATION OF THE PLAN....................................................................................33 |
|  | A. | VOTING PROCEDURES AND REQUIREMENTS...........................................33 |
|  | B. | ACCEPTANCE .............................................................................................................35 |
|  | C. | ACCEPTANCE OR REJECTION OF THE PLAN ...............................................35 |
|  | D. | CONFIRMATION OF THE PLAN...........................................................................36 |
|  | E. | THE BEST INTERESTS TEST & LIQUIDATION ANALYSIS .......................36 |
|  | F. | FEASIBILITY ...............................................................................................................37 |
| XVIII. | DISCLAIMERS ...................................................................................................................37 |
| XIX. | CONCLUSION AND RECOMMENDATION................................................................39 |

## I.       INTRODUCTION

Francis' Drilling Fluids, Ltd., FDF Resources Holdings LLC, and  Francis Logistics LLC (collectively, the "**Debtors**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases pending before the Bankruptcy Court, together with the Official Committee of Unsecured Creditors (the "**Committee**", and collectively with the Debtors, the "**Plan Proponents**"), hereby jointly propose this Combined Disclosure Statement and Joint Plan of Liquidation (together with any amendments, supplements, and exhibits thereto, the "**Disclosure Statement and Plan**" or "**DS/Plan**" or "**Combined DS/Plan**" as the case may be) for the resolution of the outstanding claims against and interests in the Debtors.

On September 29, 2018 (the "**Petition Date**"), the Debtors each filed voluntary petitions for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("**Bankruptcy Court**" or "**Court**").

On November 21, 2018, the Debtors filed a motion to sell substantially all of their assets. That sale was ultimately approved by the Bankruptcy Court on December 28, 2018, and the sale closed on December 31, 2018, for total consideration of $59,705,705.00, which consisted, in large part, of the purchaser assuming various of the Debtors' claims and liabilities.  As such, those claims and liabilities are no longer obligations of the Debtors, and all such Assumed Claims shall be deemed disallowed, expunged, and void as against the Debtors and their Estates and shall receive no distribution under the Plan.  Further, because all of the Debtors' assets have been liquidated, the only cash that remains to be distributed to holders of Allowed Claims is $30,000.00.  All holders of Allowed Claims shall be required to affirm on their ballots under penalty of perjury that their claims remain outstanding and are not Assumed Claims.

The Plan constitutes a joint liquidating chapter 11 plan for all the Debtors on a consolidated basis, and provides for the appointment of a Plan Agent to object to any claims filed against the Estates and to disburse available funds to holders of Allowed Claims on a pro rata basis.  As such, the Plan also constitutes a motion requesting that the Bankruptcy Court substantively consolidate the Debtors' estates solely for purposes of voting and making distributions as more fully set forth below.  Thus, the Plan must meet the requirements for section 1129 of the Bankruptcy Code with respect to the Debtors on a consolidated basis in order to be confirmed.

## II.      THE SOLICITATION

This Disclosure Statement and Plan is submitted by the Plan Proponents to be used in connection with the solicitation of votes on the Plan describing the terms of the liquidation of the Debtors.

The Plan Proponents have requested that the Bankruptcy Court hold a hearing on approval of this Disclosure Statement and Plan to determine whether this Disclosure Statement and Plan contains "adequate information" in accordance with § 1125.[2]  Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably

---

[2]       All citations to "§" reference the applicable section of the Bankruptcy Code.

practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records … that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the plan …." All holders of Claims and Interests are encouraged to read and carefully consider this DS/Plan in its entirety before voting to accept or reject the Plan.

In making a decision to accept or reject the Plan, each holder of a Claim or Interest must rely on its own examination of the Debtors as described in this DS/Plan, including the merits and risks involved; thus, this DS/Plan shall not be construed to be providing any legal, business, financial or tax advice. Each holder of a Claim or Interest should consult with his, her, or its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby. Additionally, confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that each of these conditions precedent will be satisfied or waived or that the Plan will be consummated. Even after the Effective Date, distributions under the Plan may be subject to delay so that disputed Claims can be resolved.

**THE PLAN PROPONENTS, WHICH INCLUDES THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO ACCEPT THE PLAN AS CONTAINED HEREIN.**

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan has been set for June [●], 2019, at [__:__] [_].m., in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas (the "**Confirmation Hearing**").

Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel for the Plan Proponents listed below to ensure receipt by them on or before 11:59 p.m. (Central), on June [●], 2019. Bankruptcy Rule 3007 governs the form of any such objection.

## III.   DEFINITIONS AND, RULES OF INTERPRETATION

### A.   DEFINITIONS

For purposes of this DS/Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article. Any term used in this DS/Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

"*Administrative Claim*" or "*Administrative Priority Claim*" means a Claim, other than an Assumed Claim, that is entitled to priority under §§ 326, 327, 330, 503(b)(1)-(9), 506(c) or 1103 asserted in this case, which Claims are described and treated in Article VI.A of this DS/Plan.

"*Allowed Claim*" means a Claim or any portion thereof (i) that has been allowed by a Final Order, (ii) that has been Scheduled as a liquidated, non-contingent, undisputed Claim in an amount greater than zero in the Debtors' Schedules, as the same may from time to time be amended in accordance with the Bankruptcy Code, Bankruptcy Rules, or order of the Bankruptcy Court, (iii) that is the subject of a timely filed proof of Claim as to which either no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code or by any order of the Bankruptcy Court, or any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, (iv) has not otherwise been previously resolved by the Debtors and creditor through entry into a critical vendor agreement or similar arrangement settling and/or resolving such pre-petition Claim, or (v) that is expressly allowed in a liquidated amount in the Plan; *provided, however* that with respect to an Administrative Claim, "Allowed Claim" means an Administrative Claim (other than a Professional Fee Claim) as to which a timely request for payment has been made by the Claims Bar Date and to which (a) a timely objection has not been filed or (b) a timely objection has been filed and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  For the avoidance of doubt, a proof of Claim filed after the Claims Bar Date shall not be an Allowed Claim for any purpose whatsoever absent entry of a Final Order allowing such late-filed Claim.

"*Assumed Claim*" means all Claims that have been assumed by FDF Energy Services under the terms of the FDF Energy Services APA.

"*Avoidance Actions*" means any actions arising under Bankruptcy Code sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, or under related state, federal, or foreign statutes and common law, including, without limitation fraudulent transfer laws.

"*Bankruptcy Cases*" means the Chapter 11 bankruptcy cases commenced by the Debtors upon the filing of a voluntary petition on the Petition Date, styled *In re Francis' Drilling Fluids, Ltd., et al.*, Case No. 18-35441 (Jointly Administered).

"*Bankruptcy Estates*" or "*Estates*" shall mean the estates of the Debtors created under § 541 upon the filing of the Bankruptcy Cases.

"*Bankruptcy Rules*" mean, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"*Carve Out Escrow*" means the account comprised of non-debtor assets established under the FDF Energy Services APA.

"*Claim*" means a claim against any portion of the Debtors' Bankruptcy Estates, whether or not asserted, as defined in § 101(5).

"*Claims Bar Date*" means February 13, 2019 for all non-governmental parties to file proofs of Claim (including Administrative Claims entitled to priority under §§ 326, 327, 330, 503(b), 506(c) or 1103 and substantial contribution Claims), and April 15, 2019 for governmental units to file any such proofs of Claim.

"*Claims Reserve*" means the reserve established under the Plan, consisting of $30,000.00 as provided in the FDF Energy Services APA, for distribution to holders of Allowed Claims on a pro rata basis.

"*Class*" means a category of holders of Claims or Interests, as described below in Article VII.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in these Cases.

"*Confirmation*" means entry by the Bankruptcy Court of the Confirmation Order confirming this Plan.

"*Confirmation Date*" means the date of entry by the Bankruptcy Court of the Confirmation Order.

"*Confirmation Hearing*" means the date set by the Court for a hearing to confirm the Plan, which has been set for June [●], 2019, at [__]:[__] [_].m. in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas.

"*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan.

"*DS/Plan*", "*Disclosure Statement and Plan*", or "*Combined DS/Plan*" shall mean this Combined Disclosure Statement and Plan of Liquidation dated as of May [●], 2019.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Effective Date*" means the date when all the conditions to the occurrence of the Effective Date set forth in Article X of this DS/Plan have been satisfied or waived in accordance with this DS/Plan.

"*FDF*" means Francis' Drilling Fluids, Ltd., a chapter 11 debtor in the Bankruptcy Cases.

"*FDF Energy Services APA*" means that certain Asset Purchase Agreement (together with all schedules and exhibits thereto), dated as of December 17, 2018 among FDF Energy Services, as purchaser, and FDF, as seller, as approved by the Court on December 28, 2018.

"*FDF Energy Services*" means FDF Energy Services LLC, the purchaser of substantially all of the Debtors' assets pursuant to the FDF Energy Services APA.

"*FDF Resources*" means FDF Resources Holdings LLC, a chapter 11 debtor in the Bankruptcy Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, as entered on the docket in the Debtors' Bankruptcy Cases, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof)

the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

"*First Lien Agent*" means PNC Bank, National Association, as administrative agent, for the benefit of itself and the lenders and letter of credit issuers party to the First Lien Credit Agreement.

"*First Lien Credit Agreement*" means that certain Revolving Credit, Term Loan and Security Agreement, dated November 23, 2010, as amended and restated by that certain Amended and Restated Revolving Credit, Term Loan and Security Agreement, dated May 4, 2012, and as further amended and restated by that certain Second Amended and Restated Revolving Credit, First Out Term Loan and Security Agreement dated as of October 27, 2014 (as otherwise amended, restated, amended and restated, supplemented or otherwise modified), by and between the Debtors and the First Lien Secured Parties.

"*First Lien Lenders*" means the First Lien Agent and such other lenders and letter of credit issuers party to the First Lien Credit Agreement.

"*First Lien Secured Parties*" means the First Lien Agent and First Lien Lenders.

"*Francis Logistics*" means Francis Logistics LLC, a chapter 11 debtor in the Bankruptcy Cases.

"*Impaired*" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of § 1124.

"*Insider*" has the meaning set forth in 11 U.S.C. § 101(31).

"*Interest*" means any ownership interest in the Debtors, as of the Petition Date, including, but not limited to, an interest in any issued, unissued, authorized or outstanding shares or stock and other equity security of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto.

"*Intercreditor Agreement*" means that certain Subordination and Intercreditor Agreement, dated as of May 4, 2012, among the First Lien Secured Parties, the Subordinated Lender, and the Debtors, as it may have been subsequently amended, amended and restated, supplemented or otherwise modified.

"*Person*" means an individual, corporation, partnership, governmental unit, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"*Petition Date*" means September 29, 2018, the date when the Debtors filed their respective chapter 11 Cases.

"*Plan*" means Articles I through XIX of this Combined DS/Plan.

"*Plan Agent*" means the Plan Agent appointed under this Plan, which shall be Greg Baracato of CR3 Partners LLC and any other successor thereto.

"**Plan Agent Expenses**" means all fees and expenses of the Plan Agent, including the Plan Expenses.

"**Plan Documents**" means any documents referenced in or attached to the Plan (or in any Plan supplement) that are intended to be executed pursuant to the Plan.

"**Plan Expenses**" means the post-Effective Date fees and expenses incurred by counsel to the Plan Agent in connection with prosecuting any objections to Claims, which amount shall be paid out of the Carve Out Escrow (to the extent available) but which shall not diminish the $30,000.00 that is to fund the Claims Reserve for distribution to holders of Allowed Claims.

"**Plan Proponents**" mean the Debtors and the Committee.

"**Prepetition Secured Lender Parties**" means the First Lien Secured Parties and the Subordinated Lender.

"**Priority Non-Tax Claim**" means a Claim asserted under §§ 507(a)(3-7 and 9-10) against the Debtors' Bankruptcy Estates.

"**Priority Tax Claim**" means a Claim entitled to priority under Bankruptcy Code section 507(a)(8).

"**Professional Fee Claim**" means a Claim by any professional retained, employed or to be compensated in the Bankruptcy Cases pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363 and/or 1103 for compensation for services rendered and reimbursement for expenses submitted in accordance with sections 330, 331, 363, or 503(b) of the Bankruptcy Code for fees and expenses incurred after the Petition Date and prior to and including the Effective Date.

"**Released party**" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Prepetition Secured Lender Parties; (c) the Committee and each of its members; and (d) with respect to each of the foregoing identified in subsections (a) through (c) herein, each of such entities' respective shareholders, affiliates, subsidiaries, members, current and former officers, current and former directors, employees, managers, agents, attorneys, investment bankers, restructuring advisors, professionals, advisors, and representatives, each in their capacities as such.

"**Releasing party**" means, collectively, and in each case only in its capacity as such: (a) each of the Debtors; (b) the Committee and each of its members; (c) the Prepetition Secured Lender Parties; (d) without limiting the foregoing, each holder of a Claim against or an Interest in the Debtors, in each case other than such a holder that has voted to reject the Plan, is a member of a class that is deemed to reject the Plan, or has voted to accept the Plan or abstains from voting on the Plan and who expressly opts out of the release provided by the Plan; and (e) with respect to each of the foregoing parties under (a) through (d), such Entity and its current and former affiliates, and such Entities' and their current and former affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"*Retained Claims*" means all claims, counterclaims, defenses (including setoff, recoupment and all other defenses of the Estates under § 558), and causes of action—whether legal or equitable—that the Debtors have or may have against any Entity relating to any Excluded Asset (as defined in the FDF Energy Services APA), and all such other claims or causes of action that are defensive in nature in respect of any proofs of claim that have been filed against the Debtors' Estates.  The Retained Claims also include any right to recovery arising out of or otherwise related to that certain Class Action Complaint, Case No. 1:19-cv-10000-UNJ filed in the U.S. Court of Federal Claims, subject to the terms and conditions of the FDF Energy Services APA.  For the avoidance of doubt, Retained Claims do not include any claims and/or causes of action that were purchased by FDF Energy Services pursuant to the FDF Energy Services APA, including without limitation, (a) all claims and causes of action against third parties in any way relating to the Purchased Assets (as defined in the FDF Energy Services APA); (b) all Avoidance Actions; and (c) all claims and causes of action against any past or present director and/or officer of the Debtors.

"*Sale*" means the sale of substantially all of the Debtors' assets to FDF Energy Services LLC approved by the Court's Sale Order.

"*Sale Order*" means the *Order (A) Approving Sale of the Debtors' Assets Subject to the Liens, Claims, Encumbrances, and Interests of the First Lien Agent, But Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granted Related Relief*, as entered by the Bankruptcy Court on December 28, 2018 [ECF No. 285].

"*Schedules*" has the meaning ascribed to such term in Article III.C hereinafter.

"*Secured Claim*" means a Claim that is secured by a valid, perfected and enforceable lien that is not subject to avoidance under bankruptcy or non-bankruptcy, but only to the extent of the value, as of the Effective Date or such later date as is established by the Bankruptcy Court, of claimant's interest in the Debtor's property securing the Claim as determined by a Final Order of the Bankruptcy Court pursuant to § 506 or as otherwise agreed upon in writing by Debtors and the holder of such Claim.

"*SOFAs*" has the meaning ascribed to such term in Article III.C hereinafter.

"*Subordinated Lender*" means Gladstone Capital Corporation and Gladstone Business Loan, LLC, as subordinated lenders under certain senior subordinated notes issued pursuant to the Subordinated Loan Agreement.

"*Subordinated Loan Agreement*" means that certain Loan Agreement, dated as of May 4, 2012 (as amended, restated, amended and restated, supplemented or otherwise modified), by and between the Debtors and the Subordinated Lender.

"*Substantial Consummation*" shall have the meaning given to that term in § 1101(2).  Substantial Consummation shall occur on the Effective Date.

"*Unassumed Claim*" means a Claim not assumed by FDF Energy Services under the terms of the FDF Energy Services APA.

"*Unimpaired Claim*" means a Claim that is not an Impaired Claim.

"*Unsecured Claim*" means a Claim that is not a Secured Claim and that is not entitled to priority under § 507(a)(1-9), and includes the deficiency portions of a Secured Claim.

"*Voting Deadline*" means May [●], 2019, at 11:59 p.m. (Central), the deadline by which Ballots to accept or reject the Plan must be received by Debtors' claims and noticing agent in order to be counted.

**B.     RULES OF INTERPRETATION**

For purposes of this DS/Plan, (a) any reference to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references herein to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this DS/Plan; (d) the words "herein" and "hereto" refer to this DS/Plan in its entirety rather than to a particular portion of this DS/Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this DS/Plan; and (f) the rules of construction set forth in § 102 and in the Bankruptcy Rules shall apply.

**C.     INCORPORATION OF DOCUMENTS BY REFERENCE**

This DS/Plan incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith.  The documents that have been filed in the Debtors' Bankruptcy Cases are incorporated by reference herein in their entirety, including all amendments thereto filed prior to the date set for confirmation, including the following documents: (a) the Debtors' Schedules of Assets and Liabilities ("**Schedules**"), (b) the Statements of Financial Affairs ("**SOFAs**"), including exhibits to the SOFAs, each as filed on October 27, 2018 [ECF Nos. 118, 119, 120, 121, 122 and 123], (c) the FDF Energy Services APA, and (d) the Sale Order [ECF No. 285].  Documents and pleadings filed in these Cases are available at the following website: https://cases-cr.stretto.com/francisdrilling.

## IV.   DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR EVENTS

### 1.    Incorporation and Ownership Structure

Headquartered in Lafayette, Louisiana, FDF is a Louisiana corporation that was founded in 1977 as a supplier of drilling fluids and rental equipment.  At the time it operated, all of the Debtors' employees were employed by FDF, which included over 400 industry professionals (i.e., truck drivers, mechanics, plant operators, and technicians).  FDF was one of the largest providers of frac material logistics, onshore/offshore cleaning services, and drilling fluid sales across Wyoming, North Dakota, Oklahoma, Louisiana, and Texas.

FDF Resources is a Delaware limited liability company, which owns 100% of FDF.  Other than FDF Resources' ownership interest in FDF, FDF Resources owns no other assets and has no employees.  Prophet Equity LP owns 95.44% of the equity of FDF Resources, with Gladstone Capital Corporation owning the remaining 4.56%.

Francis Logistics LLC is a Delaware limited liability company. As of the Petition Date, Francis Logistics had no assets, operations, or employees.

### 2.    Management

As of the Petition Date, the Debtors' management consisted of the following individuals:

| | |
|---|---|
| Barry Charpentier, President | Mr. Charpentier is the President of FDF.  Mr. Charpentier also serves on the board of directors of FDF. |
| Eric Frey, Chief Financial Officer | Mr. Frey is the Chief Financial Officer of FDF. |
| Ross Gatlin, Chief Executive Officer | Mr. Gatlin is the Chief Executive Officer of FDF.  Mr. Gatlin also serves on, and is the chairman of, the board of directors of FDF. |
| John Tatum, Chief Strategy Officer | Mr. Tatum is the Chief Strategy Officer of, FDF.  Mr. Tatum also serves on the board of directors of FDF. |
| Charles Collie, Sr. V.P. - Finance | Mr. Collie is the Sr. V.P. – Finance of FDF.  Mr. Collie also serves on the board of directors of FDF. |
| Michael Hirschfeld, Sr. V.P. – Operations & Secretary | Mr. Hirschfeld is the Sr. V.P. - Operations & Secretary of FDF.  Mr. Hirschfeld also serves on the board of directors of FDF. |

Effective as of the Petition Date, the Debtors retained Greg Baracato of CR3 Partners, LLC to serve as the Chief Restructuring Officer of the Debtors.

3.      **Products and Services**

The following is a brief description of the products and services that the Debtors offered (all via FDF) prior to the Sale:

    a.      **Pneumatics**.   Hauling and transloading of frac sand and proppant over owned/leased rail spurs, warehouses and pneumatic trailers.  Prior to the Petition Date, approximately 45% of FDF's sales related to its pneumatics business.

    b.      **Drilling Fluids**.  Sale and transport of primarily water and oil based drilling and completion fluids and related rental equipment/services.  Prior to the Petition Date, approximately 40% of FDF's sales related to its drilling fluids business.

    c.      **Cleaning Services**.  Rig washing/cleanouts, offshore and dockside cleaning, frac tank cleanouts and miscellaneous cleaning.  Prior to the Petition Date, approximately 15% of FDF's sales related to its cleaning services business.

4.      **Assets and Liabilities of the Debtors as of the Petition Date**

The Debtors filed their respective Schedules on October 27, 2018 [ECF Nos. 118, 120, and 122].  Those Schedules provide additional detail about the assets and liabilities of each of the Debtors, and those documents are incorporated herein by reference and can be reviewed free of charge at the following website:  https://cases-cr.stretto.com/francisdrilling.

    **Assets:**

Based on book value, FDF's assets totaled approximately $86,946,407.70 as of the Petition Date, and primarily consisted of cash, accounts receivable, real estate, inventory and other goods, and goodwill.[3]  FDF Resources' only asset is its 100% ownership interest in FDF, and FDF Logistics is a holding company that never operated nor had any assets.

    **Secured Debt:**

As of the Petition Date, the Debtors were each jointly and severally indebted and liable to the First Lien Secured Parties for all of the "First Lien Indebtedness" (as defined in the Final Cash Collateral Order at ECF No. 212, which is incorporated herein by reference), which included, among other things: (i) revolving advances in an amount not less than $24,903,109.16 under the First Lien Credit Agreement; (ii) a term loan made by the First Lien Lenders in the aggregate principal amount of not less than $25,661,039.36 under the First Lien Credit Agreement; and (iii) not less than $65,000.00 in face amount of undrawn letters of credit under the First Lien Credit Agreement, together with all accrued and unpaid interest, fees, expenses, and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Credit Agreement and related loan documents.

---

[3] Approximately $19,700,125.60 of this total book value accounted for goodwill.

As of the Petition Date, the Debtors were also each jointly and severally indebted and liable to the Subordinated Lender under the Subordinated Loan Agreement in the aggregate amount of approximately $27,818,742.13.  In accordance with the Intercreditor Agreement and section 510(a) of the Bankruptcy Code, the liens and claims of the Subordinated Lender under the Subordinated Loan Agreement are subordinated to the liens and claims of the First Lien Secured Parties under the First Lien Credit Agreement until the First Lien Indebtedness has been paid in full.

**Priority Unsecured Debt:**

As set forth in the FDF's Schedule E, as of the Petition Date approximately $369,118.91 of unsecured creditors held priority unsecured claims.  Neither FDF Resources nor FDF Logistics held any priority unsecured debt.

**Unsecured Debt:**

As set forth the FDF's Schedule F, as of the Petition Date, the total unsecured debt was $6,440,211.77 (not including any deficiency claims of the First Lien Secured Parties or of the Subordinated Lender).  Neither FDF Resources nor FDF Logistics held any unsecured debt aside from any deficiency claims of the First Lien Secured Parties and the Subordinated Lender.

**5.      Events Leading to the Debtors' Bankruptcy Filing.**

**(A)      The Downturn in the Oil and Gas Industry.**

As has been typical with many oil and gas companies, FDF's business was affected by a sustained downturn in the oil and gas industry brought on by low commodity prices.  The combination of low oil prices and reduced capital expenditures by many of the major exploration and production companies directly impacted FDF and the oil and gas services industry as a whole, due in part to increased competition, reduced rates, and an overall decline in need for certain oil and gas services.

In response to these market conditions, FDF implemented various initiatives in July 2018 to reduce costs, increase efficiency, and maintain its historically profitable operations. Specifically, FDF reduced its headcount resulting in monthly cost savings of over $100,000 per month, sold its Salisaw, Oklahoma facility, eliminated an office in Erath, Texas, and implemented other cost containment programs with estimated monthly cost savings of over $80,000 per month.

**(B)      The Debtors' Decrease in Cash Flow and Profitability.**

Notwithstanding FDF's efforts, FDF's cash flow and profitability remained significantly under budget due, in large part, to the following key factors:

Loss of mud work:  FDF lost certain full service mud work to a competitor in April and May 2018 resulting in a net loss of approximately $300,000 per month of revenue, and $105,000 per month of EBITDA at a 35% contribution margin in May 2018.

-11-

Overall cost increases:  Cost increases of hiring and retaining drivers impacted FDF.  In 2018 up to the Petition Date, FDF hired 154 drivers; yet, over this same time period, FDF lost 152 drivers.  Hiring and training cost FDF approximately $3,000 to $4,000 per driver.

Higher repair and maintenance costs:  FDF's truck fleet was aging, resulting in higher repair and maintenance costs.

Loss of certain high margin business:  In 2017, FDF lost certain high margin business due to: (a) the buyout of a certain Lake Charles contract by another oilfield services company resulting in a $1.85 million margin reduction; and (b) the loss of certain high margin pneumatics contracts in the fourth quarter of 2017 resulting in a $1.3 million margin reduction.

Increasing fleet age:  FDF's increasing fleet age impacted customer service and the ability to attract and retain drivers.

As a result of the above, FDF's cash flow and EBITDA did not support its current debt structure, and FDF was unable to make its monthly interest payment and scheduled principal payments due under the First Lien Credit Agreement on October 1, 2018.

## V.    MAIN EVENTS IN THE BANKRUPTCY CASES

### A.    CLAIMS BAR DATE

Pursuant to the Notice of Chapter 11 Bankruptcy Cases [ECF No. 89], the deadline for non-governmental parties to file proofs of claim or interests was set for February 13, 2019, and the deadline for governmental units to file proofs of claim is set for April 15, 2019.

### B.    MEETING OF CREDITORS

The 341 meeting of creditors was held and concluded on November 15, 2018.

### C.    RETENTION OF PROFESSIONALS

On November 30, 2018, the Debtors filed their Application to Employ JND Corporate Restructuring as Claims, Noticing, and Solicitation Agent ("**JND**") [ECF. No. 10].  JND's employment application was approved on October 2, 2018.[4]

On October 12, 2018, the Debtors filed the following additional employment applications: (a) Application to Employ SSG Advisors, LLC ("**SSG**") as Investment Banker [ECF. No. 72]; (b) Application to Employ CR3 Partners, LLC ("**CR3**") and Greg Baracato as Financial Advisor and Chief Restructuring Officer [ECF. No. 73]; and (c) Application to Employ Norton Rose Fulbright US LLP ("**NRF**") as Debtors' Counsel [ECF. No. 74].  Orders authorizing and approving

---

[4] JND changed its company name to Stretto subsequent to its employment in these Cases.  *See* ECF No. 305.  Stretto continues to serve the Debtors in these Cases as their claims and noticing agent.

these employment applications were entered by the Court on November 1, 2018.  *See* ECF Nos. 144, 145 and 146.

On October 29, 2018, the Committee filed the following employment applications: (a) Application to Employ Greenberg Traurig, LLP ("**Greenberg Traurig**") as Counsel to the Official Committee of Unsecured Creditors [ECF No. 125]; and (b) Application to Employ Conway Mackenzie, Inc. ("**Conway Mackenzie**") as Financial Advisor to the Official Committee of Unsecured Creditors [ECF No. 126].

The Committee later sought to replace Greenberg Traurig as Committee counsel, and on November 19, 2018, the Committee filed an Application to Employ Bradley L. Drell and the Law Firm of Gold, Weems, Bruser, Sues & Rundell ("**Gold Weems**") as Attorneys [ECF No. 200]. Thereafter, on November 29, 2018, the Committee also filed an Application to Employ Baker Donelson as Local Counsel [ECF No. 237].

On November 20, 2018, the Court entered an Order Concerning UCC Application relating to the Greenberg Traurig application [ECF No. 215], as well as orders authorizing and approving the employment of Gold Weems and Conway Mackenzie [ECF Nos. 216 and 217].  On December 13, 2018, the Court approved the Baker Donelson employment application [ECF No. 259].

## D.      CERTAIN ORDERS AND EVENTS IN THE BANKRUPTCY CASE

On September 29, 2018, the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code [ECF No. 1].  That same day, the Debtors filed various "first day" motions, which included: (a) Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Payment of Certain Claims of Critical Vendors, (II) Approving Related Payment Procedures, and (III) Granting Related Relief (the "**Critical Vendor Motion**") [ECF No. 6]; and (b) Emergency Motion for Entry of an Order Authorizing Payment of Certain Prepetition (A) Wages, Salaries, and Other Compensation; (B) Reimbursable Employee Expenses; (C) Employee Benefits; and (D) Related Costs (the "**Wage Motion**") [ECF No. 7].

On October 1, 2018, the Debtors filed their Emergency Motion for Entry of a Limited Order (A) Authorizing Use of Cash Collateral and Granting Adequate Protection to Prepetition Lenders and (B) Scheduling a Second Interim Hearing (the "**Cash Collateral Motion**") [ECF No. 21].

On October 2, 2018, the Court entered interim orders granting the (a) Critical Vendor Motion [ECF No. 31]; (b) Cash Collateral Motion [ECF No. 32]; and (c) Wage Motion [ECF No. 33].  A second interim order regarding the Critical Vendor Motion was entered on October 15, 2018 [ECF No. 79].

On October 16, 2018, the Court entered a second interim order granting the Debtors' use of cash collateral [ECF No. 86].

On October 17, 2018, the Office of the United States Trustee appointed the Committee [ECF No. 90].

On October 29, 2018, the Debtors filed an Emergency Motion for Entry of an Order (A) Authorizing the Payment of Certain Prepetition Taxes and (B) Granting Related Relief (the "**Tax Motion**") [ECF No. 124]. The Tax Motion was approved on November 1, 2018 [ECF No. 148].

On November 1, 2018, the Court entered final orders on the Critical Vendor Motion [ECF No. 147].

On November 9, 2019, the Court entered a third interim order granting the Debtors' use of cash collateral [ECF No. 174]; a fourth interim cash collateral order was subsequently entered on November 16, 2018 [ECF No. 191]; and a final cash collateral order was entered on November 20, 2018 (collectively with all interim cash collateral orders, the "**Cash Collateral Order**") [ECF No. 212].

On November 21, 2018, the Debtors filed their Emergency Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling an Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief (the "**Bid Procedures Motion**") [ECF No. 220]. The Court approved the Bid Procedures Motion on November 29, 2018 (the "**Bid Procedures Order**") [ECF No. 236].

On December 17, 2018, the Debtors filed their Notice of Selection of Stalking Horse Bid, naming FDF Energy Services as the stalking horse bidder [ECF No. 266].

On December 27, 2018, the Debtors filed their Emergency Motion for Entry of an Order (A) Approving the Sale of the Debtors' Assets Subject to the Liens, Claims, Encumbrances, and Interests of the First Lien Agent, But Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief (the "**Sale Motion**") [ECF No. 281]. The Sale Motion was granted by the Court on December 28, 2018 (the "**Sale Order**") [ECF No. 285], and the sale transaction closed on December 31, 2018 [ECF No. 288].

These and other pleadings can be accessed free of charge on the website of the Debtors' claims and noticing agent at https://cases-cr.stretto.com/francisdrilling.

## E.   SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS AND ASSUMPTION OF CERTAIN CLAIMS AND LIABILITIES

As referenced above, on November 29, 2018, the Court entered the Bid Procedures Order which established the following dates and deadlines (each of which remained subject to modification by the Debtors with the consent of the Committee and First Lien Agent):

- December 7, 2018 as the deadline by which the Debtors were required to select a Stalking Horse Bidder, if any;

- December 21, 2018 as the deadline by which all bids for the Debtors' assets were required to be received;

- December 27, 2018 as the date of the auction, if any; and

- December 28, 2018 as the sale hearing date.

Pursuant to the Bid Procedures (as defined in the Bid Procedures Order and as modified by the Debtors, Committee and First Lien Agent), the Debtors selected FDF Energy Services to serve as the stalking horse bidder. No other Qualified Bids (as defined in the Bid Procedures Order) were ultimately received by the Debtors by the applicable bid deadline; accordingly, the Debtors did not need to conduct an auction and proceeded to seek approval of the stalking horse bid at the December 28, 2018 sale hearing (the "**Sale Hearing**"). The Court approved the sale to FDF Energy Services pursuant to the FDF Energy Services APA at that Sale Hearing.

Pursuant to the FDF Energy Services APA, FDF Energy Services acquired substantially all of the Debtors' assets, which included, among other things, all of the Debtors' cash, accounts receivable, machinery and equipment, inventory, licenses, and all Avoidance Actions and claims and causes of action against the Debtors' current and former directors and officers. FDF Energy Services also agreed to assume the Assumed Claims and various liabilities of the Debtors, including certain Cure Amounts and Vendor Claims (each as defined in the FDF Energy Services APA), for a total consideration of $59,705,705.00.

As part of this sale and the intense negotiations between the Debtors, Committee and First Lien Agent, FDF Energy Services agreed not to pursue any of the Avoidance Actions that it purchased against the Debtors' creditors,[5] and via the Sale Order, the Court expressly approved and ordered the same [ECF No. 285].

Additionally, because FDF Energy Services purchased substantially all of the Debtors' assets, including its cash, the Debtors, Committee and First Lien Agent negotiated for the establishment of a "Carve Out Escrow" in an amount not to exceed $1,657,000.00, which non-estate funds are currently being held in the Committee counsel's trust account and will be used to satisfy, among other things, the Professional Fee Claims, the U.S. Trustee quarterly fees, and the Plan Agent Expenses. As provided by the FDF Energy Services APA, "[t]o the extent funds remain in the Carve Out Escrow after satisfaction of the Carve Out Obligations, any such balance up to $30,000.00 shall be remitted to the [Debtors' bankruptcy estates]. . . ." This $30,000.00 is the amount that will fund the Claims Reserve, and which will ultimately be distributed by the Plan Agent to holders of Allowed Claims.[6]

---

[5] Per the Debtors' SOFAs, the Debtors identified $14,017,525.74 of transfers made to creditors in the ninety (90) days preceding its bankruptcy filing. *See* ECF No. 119, Item 3. While those transfers would ordinarily be subject to being clawed back, the Debtors, Committee and First Lien Agent negotiated for these Avoidance Actions to be "buried", thereby resulting in a significant benefit to the Debtors' creditors.

[6] Reference to the FDF Energy Services APA should be made for the full terms of the sale, which terms are incorporated here as if fully set forth herein.

## VI.     UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified under the Plan, and the treatment of those Claims is set forth herein.

## A.     ADMINISTRATIVE CLAIMS

As provided under Bankruptcy Code section 1123(a)(1), Administrative Claims are not classified for purposes of voting on, or receiving distributions under, the Plan.  Accordingly, holders of Administrative Claims are not entitled to vote on this Plan.

### 1 – PROFESSIONAL FEE CLAIMS

Subject to the terms of the paragraph immediately below, Allowed Professional Fee Claims shall be paid in full out of the Carve Out Escrow on the later of the Effective Date or the date such Professional Fee Claim becomes an Allowed Claim.  The holders of the Professional Fee Claims shall file and serve an application for final allowance of compensation and reimbursement of expenses no later than the thirtieth (30th) day after the Effective Date.

Notwithstanding the foregoing, to the extent the Carve Out Escrow contains insufficient funds on the Effective Date to pay all Allowed Professional Fee Claims in full, each professional shall receive only a pro-rata distribution on account of its Allowed Professional Fee Claim.  The Debtors are informed and believe that all the professionals have agreed to the foregoing treatment and will be bound by such agreement under the Plan.

### 2 – U.S. TRUSTEE QUARTERLY FEES

The U.S. Trustee Quarterly Fees encompasses those fees assessed pursuant to 28 U.S.C. § 1930(a)(6).  The Debtors' Estates shall be responsible for timely payment of the U.S. Trustee quarterly fees incurred pursuant to § 1930(a)(6) without the need for the Office of the United States Trustee to file any request for payment.  Any such fees due as of the Confirmation Date will be paid in full on the Effective Date out of the Carve Out Escrow.  The Plan Agent shall timely pay or cause to be paid post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) out of available funds in the Carve Out Escrow until such time as the Bankruptcy Court enters a final decree closing these Bankruptcy Cases, or enters an order either converting these Bankruptcy Cases to a cases under chapter 7 or dismissing these Cases.  After confirmation, the Plan Agent shall file with the Bankruptcy Court and shall transmit to the U.S. Trustee a statement of all disbursements made by the Plan Agent for each quarter, or portion thereof that these Bankruptcy Cases remain open in a format prescribed by the U.S. Trustee.

### 3 – ALL OTHER ADMINISTRATIVE CLAIMS

**Description**.  All Administrative Claims that have been timely filed by the Claims Bar Date other than Professional Fee Claims and fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930.

**Treatment**.  Those Administrative Claims, other than Professional Fee Claims and fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, that were set forth in Section 1.2(a) through (v) of the FDF Energy Services APA are treated as Assumed Claims and either have already been paid or will be paid by FDF Energy Services in the ordinary course of business in the manner and to the extent set forth in  the FDF Energy Services APA. Any request for payment of an Administrative Claim that is an Assumed Claim, other than Professional Fee Claims and fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, shall be deemed disallowed, expunged, and void as against the Debtors or their Estates as of the Confirmation Date.

To the extent of any Allowed Administrative Claims that are Unassumed Claims that have not already been paid, satisfied, or otherwise released prior to the Effective Date, and except to the extent that a holder of such Allowed Unassumed Administrative Claim agrees to a different treatment, each holder of an Allowed Unassumed Administrative Claim shall receive cash in an amount equal to such Allowed Unassumed Administrative Claim, in full and final satisfaction, settlement, and release and in exchange for such Claim, on the later of the Effective Date or the date such Unassumed Administrative Claim becomes an Allowed Unassumed Administrative Claim pursuant to a Final Order of the Bankruptcy Court, or as soon thereafter as reasonably practicable.

### 4 –PRIORITY TAX CLAIMS

**Description**.  The Priority Tax Claims listed on Schedule E of the Debtors' Schedules (which are undisputed, liquidated and not contingent) and/or timely filed in the Bankruptcy Cases by the Claims Bar Date.

**Treatment**.  Those Priority Tax Claims that were set forth in Section 1.2(a) through (v) of the FDF Energy Services APA are treated as Assumed Claims and either have already been paid or will be paid by FDF Energy Services in the ordinary course of business in the manner and to the extent set forth in the FDF Energy Services APA.  Any Proof of Claim filed asserting a Priority Tax Claim and that is an Assumed Claim shall be deemed disallowed, expunged, and void as against the Debtors or their Estates as of the Confirmation Date.

To the extent of any Allowed Priority Tax Claims that are Unassumed Claims and that have not already been paid, satisfied, or otherwise released prior to the Effective Date, and except to the extent that a holder of an Allowed Unassumed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Unassumed Priority Tax Claim shall receive cash in an amount  equal to such Allowed Unassumed Priority Tax Claim, in full and final satisfaction, settlement, and release in exchange for such Claim, on the later of the Effective Date or the date such Unassumed Priority Tax Claim becomes an Allowed Claim pursuant to a Final Order of the Bankruptcy Court, or as soon thereafter as is reasonably practicable, which may be paid through deferred cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Unassumed Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored general unsecured claim provided for by the Plan.

The Debtors do not believe that there are any Unassumed Priority Tax Claims.

## VII.   CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

All Claims and Interests are placed in the Classes set forth below.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled.

**A.**  **CLASS 1 - ALLOWED PRIORITY NON-TAX CLAIMS**

**Description**.  Class 1 consists of the Allowed Priority Non-Tax Claims.

**Treatment**.  The Debtors believe that all Priority Non-Tax Claims have been satisfied in full via the Court's "first day" orders and/or have been assumed by FDF Energy Services under the terms of the FDF Energy Services APA.  To the extent that there is an Allowed Priority Non-Tax Claim that has not already been satisfied, each such Allowed Priority Non-Tax Claim in this Class shall be paid in full from the Claims Reserve on the later of the Effective Date or the date such Priority Non-Tax Claim becomes an Allowed Claim.

**Voting**.  Class 1 is not Impaired.  Holders of Class 1 Priority Non-Tax Claims are deemed to have accepted this Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**B.**  **CLASS 2 – ALLOWED SECURED CLAIMS**

1.  <u>Subclass 2A</u>:  Secured Claim of the First Lien Secured Parties.

**Description**.  Subclass 2A consists of the Allowed Secured Claim of the First Lien Secured Parties, which have a first priority lien on substantially all of the Debtors' assets.

**Treatment**.  The Secured Claim of the First Lien Secured Parties shall be Allowed for purposes of voting and distribution under the Plan.  The Secured Claim of the First Lien Secured Parties shall be satisfied in full from (i) FDF Energy Services' assumption of the First Lien Secured Parties' indebtedness pursuant to the FDF Energy Services APA; (ii) any assets remaining in the Carve Out Escrow after (a) payment of any Allowed Professional Fee Claims, U.S. Trustee quarterly fees, and the Plan Agent Expenses and (b) funding of the Claims Reserve; and (iii) the retention of liens securing the Allowed Secured Claim of the First Lien Secured Parties on any and all assets of the Debtors that were not previously sold to FDF Energy Services.  The deficiency amount on account of the Subclass 2A Claim shall be treated as a Class 4 Claim.  The First Lien Secured Parties have agreed to subordinate their Class 2A Claim to the recoveries to Class 3 solely to the extent of the amount in the Claims Reserve.

**Voting**.  Subclass 2A is Impaired.  Holders of Class 2A Claims are entitled to vote on the Plan.

2.      <u>Subclass 2B</u>:  Secured Claim of Subordinated Lender.

**Description**.  Subclass 2B consists of the Secured Claim of the Subordinated Lender, which has a second priority lien on substantially all of the Debtors' assets.

**Treatment**.  If the Claims in Class 2A have been paid in full, the Secured Claim of the Subordinated Lender shall be satisfied from (ii) any assets remaining in the Carve Out Escrow after (a) payment of any Allowed Professional Fee Claims, U.S. Trustee quarterly fees, and the Plan Agent Expenses and (b) funding of the Claims Reserve (in each case only after payment in full of Class 2A), and (ii) the retention of liens securing the Secured Claim of the Subordinated Lender on any and all assets of the Debtors that were not previously sold to FDF Energy Services. The deficiency amount on account of the Subclass 2B Claim shall be treated as a Class 4 Claim. The Subordinated Lender has agreed to subordinate its Class 2B Claim to the recoveries to Class 3 solely to the extent of the amount in the Claims Reserve.

**Voting**.  Subclass 2B is Impaired.  Holders of Class 2B Claims are entitled to vote on the Plan.

3.      <u>Subclass 2C</u>:  Other Unassumed Secured Claims.

**Description**.  Subclass 2C consists of Other Unassumed Secured Claims of the Debtors.

**Treatment**.  On the Effective Date (or as soon as reasonably practicable thereafter), except to the extent that a holder of an Allowed Other Unassumed Secured Claim against a Debtor agrees to less favorable treatment, each holder of an Allowed Other Unassumed Secured Claim shall receive, at the Debtors' election: (a) cash equal to the amount of such Allowed Other Unassumed Secured Claim; (b) such other less favorable treatment as to which the Debtors and the holder of an Allowed Other Unassumed Secured Claim have agreed; (c) a return of the collateral securing the Allowed Other Unassumed Secured Claim; or (d) such other treatment rendering such Claim Unimpaired. The Debtors do not believe that there are any holders of Class 2C Allowed Other Unassumed Secured Claims.

**Voting**.  Subclass 2C is Impaired.  Holders of Class 2C Claims are entitled to vote on the Plan.  Holders asserting a Claim in Subclass 2C must state on their ballots, under penalty of perjury, that they hold an Other Unassumed Secured Claim.  Holders of Subclass 2C Claims that do not return their ballots or do not indicate whether their Claims are Other Unassumed Secured Claims shall not receive a distribution under the Plan.

## C.      CLASS 3 – ALLOWED UNASSUMED GENERAL UNSECURED CLAIMS

**Description**.  Class 3 consists of the Allowed Unassumed Claims of Unsecured Creditors other than with respect to any deficiency portions of any of Secured Claims (which are treated as Class 4).

**Treatment**.  Except to the extent that the holder of an Allowed Unassumed General Unsecured Claim agrees to a different treatment, such holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Unassumed General Unsecured Claim, a pro rata distribution from the Claims Reserve as soon as reasonably

practical on or after the later of (a) the Effective Date, (b) the end of the ninety-day claims objection period, and (c) such Unassumed General Unsecured Claim becomes an Allowed Claim. Holders asserting a Claim in Class 3 must state on their ballots, under penalty of perjury, that they hold an Unassumed General Unsecured Claim. Holders of Class 3 Claims that do not return their ballots or do not indicate whether their Claims are Unassumed General Unsecured Claims shall not receive a distribution under the Plan or otherwise.

**Voting**. Class 3 is Impaired. Holders of Class 3 Claims are entitled to vote on the Plan.

## D.    CLASS 4 – ALLOWED DEFICIENCY CLAIMS OF THE FIRST LIEN SECURED PARTIES AND THE SUBORDINATED LENDER

1.    Subclass 4A:  Allowed Deficiency Claims of the First Lien Secured Parties.

**Description**. Class 4A consists of the deficiency Claims of the First Lien Secured Parties.

**Treatment**. The deficiency Claims of the First Lien Secured Parties shall be Allowed for purposes of voting and distribution under the Plan. Except to the extent that the holder of an Allowed Class 4 Claim agrees to a different treatment, such holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Class 4 Claim, a distribution from the Carve Out Escrow after (a) payment of any Allowed Professional Fee Claims, U.S. Trustee quarterly fees, and the Plan Agent Expenses and (b) funding of the Claims Reserve for the benefit of holders of Class 3 Allowed Claims. Holders of Class 4A Claims have agreed to subordinate their Claim to the recoveries to Class 3 solely to the extent of the amount in the Claims Reserve.

**Voting**. Class 4A is Impaired. Holders of Class 4A Claims are entitled to vote on the Plan.

2.    Subclass 4B:  Allowed Deficiency Claims of the Subordinated Lender.

**Description**. Class 4B consists of the deficiency Claims of the Subordinated Lender.

**Treatment**. Except to the extent that the holder of an Allowed Class 4B Claim agrees to a different treatment, such holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Class 4B Claim, a distribution from the Carve Out Escrow after (a) payment of any Allowed Professional Fee Claims, U.S. Trustee quarterly fees, and the Plan Agent Expenses, (b) funding of the Claims Reserve for the benefit of holders of Class 3 Allowed Claims, and (c) after payment in full of the Allowed Class 4A Claims; provided, however, that, in accordance with the Intercreditor Agreement and section 510(a) of the Bankruptcy Code, unless and until the holders of Class 4A Claims have been paid in full, any distributions that would otherwise be payable to the holder of an Allowed Class 4B Claim shall instead be distributed the holders of Class 4A Claims; provided further, however, that the Subordinated Lender has agreed to subordinate its Class 4B Claim to the recoveries to Class 3 solely to the extent of the amount in the Claims Reserve.

**Voting**. Class 4B is Impaired. Holders of Class 4B Claims are entitled to vote on the Plan.

E.      **CLASS 5 – ALLOWED INTERESTS OF THE DEBTORS**

**Description**.  Class 5 consists of the Allowed Interests of the Debtors' equity owners.

**Treatment**.  On the Effective Date, all Interests in each Debtor shall be cancelled and of no further force or effect.  Holders of Interests shall neither retain nor receive any property under the Plan on account of such Interests.

**Voting**.  Class 5 is Impaired.  Holders of Class 5 Interests are deemed to reject the Plan under Section 1126(g) of the Bankruptcy Code and not entitled to vote on the Plan.

F.      **CLASS 6 –LIABILITIES ASSUMED UNDER THE FDF ENERGY SERVICES APA**

**Description**:  Class 6 are only the Assumed Claims and liabilities specifically assumed by FDF Energy Services under the express terms of the FDF Energy Services APA.

**Treatment**:  Class 6 Claims include only those specific claims assumed under Section 1.2 of the FDF Energy Services APA and only up to the aggregate amounts set forth therein.  Class 6 Claims either have already been paid or will be paid in the ordinary course of business in the manner and to the extent set forth in the FDF Energy Services APA.  All Class 6 Claims shall be deemed disallowed, expunged, discharged, and void as against the Debtors or their Estates as of the Confirmation Date.  Class 6 Claims shall not receive any distribution under the Plan.

**Voting**:  Class 6 is Impaired.  Holders of Class 6 Claims are deemed to reject the Plan under Section 1126(g) of the Bankruptcy Code and not entitled to vote on the Plan.

## VIII.   MEANS FOR EXECUTION OF THE PLAN

A.      **FUNDING THE PLAN**

The Plan is a liquidating plan that will be funded with $30,000.00 from the Carve Out Escrow to establish the Claims Reserve.  The post-Effective Date fees and expenses incurred by the Plan Agent and his professionals in connection with prosecuting any objections to Claims shall also be paid out of the Carve Out Escrow solely to the extent that funds remain after (a) payment of any Allowed Professional Fee Claims and U.S. Trustee quarterly fees and (b) funding of the Claims Reserve.

B.      **CLAIMS RESERVE**

As soon as practicable after the Confirmation Date, the Claims Reserve shall be established and funded from the Carve Out Escrow in the amount of $30,000.00.  The Claims Reserve shall remain non-Estate property and shall continue to be held by Gold Weems or in a separate account established by the Plan Agent.  The Carve Out Escrow shall otherwise remain in existence until all Allowed Professional Fee Claims, U.S. Trustee fees, and Plan Agent Expenses are paid and satisfied in full.  Any amounts remaining in the Carve Out Escrow after taking into account the above fees and expenses shall be distributed in accordance with this Plan.

C.      **SUBSTANTIVE CONSOLIDATION OF THE DEBTORS**

The Plan constitutes a motion for the substantive consolidation of the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making distributions pursuant to the Plan.  Voting on the Plan shall be counted on a consolidated basis. On the Effective Date, solely for purposes of voting on the Plan, objecting to the allowance of Claims provided for under the Plan, and making distributions under the Plan: (a) the Assets of the Debtors will be pooled for the purpose of paying Allowed Claims against the Debtors; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against all of the Debtors; (c) all Claims of each Debtor against any other Debtor will be eliminated; and (d) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors.  Additionally, Holders of Allowed Claims or Allowed Interests who assert identical Claims against or Interests in multiple Debtors shall be entitled to only a single satisfaction of such Claims or Interests, and any such duplicate Claims shall be deemed disallowed, expunged, and void as against the Debtors without need for the filing of a Claim Objection or further order of the Court and such duplicate Claims or Interests shall receive no distribution under the Plan.

## D.    APPOINTMENT OF THE PLAN AGENT

### 1.    Appointment Of The Plan Agent.

Greg Baracato of CR3 Partners LLC shall serve as the Plan Agent, who shall be vested with all the powers of a debtor-in-possession and chapter 11 trustee.  The appointment of Mr. Baracato as Plan Agent shall be effective as of the Effective Date.

The selection of any successor Plan Agent shall be made by the Bankruptcy Court following a hearing.  The Plan Agent shall be empowered to act on behalf of the Debtors' Estates and to carry out the provisions of this Plan.  The Plan Agent shall not have an interest that is materially adverse to the Debtors or the Estates.

### 2.    Powers And Duties Of The Plan Agent.

The Plan Agent shall be deemed to possess the same powers and duties as would a chapter 11 trustee consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  On the Effective Date, the Plan Agent shall be empowered and authorized to take or cause to be taken all actions which in his judgment are necessary to secure the effective implementation of the Plan.  The Plan Agent shall be empowered to file objections as to all Claims (the "**Claims Objections**"),[7] and shall be deemed to be a representative of the Debtors' Estates pursuant to Bankruptcy Code section 1123(b)(3) and as such will have the power to prosecute and defend, the Claims Objections.  In that regard, the Plan Agent shall have the power and authority to perform the following acts:

      1.    Establish any necessary accounts or reserves, including the Claims Reserve;

---

[7] For the avoidance of doubt, nothing herein shall require the Plan Agent to file and/or prosecute any Claim Objections if the Plan Agent determines, in his sole and exclusive business judgment, that the cost of taking such action would exceed any benefits ultimately obtained.

2.  Distribute available proceeds, including those in the Claims Reserves and any funds remaining in the Carve Out Escrow in accordance with this Plan;

3.  Open bank accounts, deposit proceeds and draw checks and make disbursements thereof;

4.  Employ and have such attorneys, experts, accountants, clerical assistance or other professionals as may be deemed necessary;

5.  Pay (or direct to pay) and discharge any costs, expenses, fees or obligations incurred by the Plan Agent as are necessary to liquidate any remaining assets of the Bankruptcy Estates, including prosecuting the Claims Objections as provided for herein;

6.  Take any action required or permitted by the Plan;

7.  Sue and be sued with respect to the Claims Objections;

8.  Settle, compromise or adjust by arbitration, mediation or otherwise, any of the Claims Objections, without further order of the Court;

9.  Take any action necessary or required to change the corporate names of the Debtors and/or to otherwise dissolve the Debtors;

10. In general, without in any manner limiting any of the foregoing, take any action that would be lawful for any person having the duties and responsibilities described in this Plan, whether similar to or different from the ways above specified.

**3.      Release.**

The Plan Agent will be released and indemnified for all obligations and liabilities of the Debtors, save and except those duties and obligations of the Plan Agent set forth in the Plan and those attributable to the gross negligence or willful misconduct of the Plan Agent.

**4.      Monitoring, Auditing And Bonding.**

The Plan Agent will not be required to post bond or be audited or monitored except as otherwise expressly provided herein.

**5.      Compensation Of The Plan Agent And Retention Of Professionals.**

The Plan Agent shall be entitled to receive compensation for services rendered and shall be entitled to retain agents and professionals[8] in accordance with the provisions of this Plan.  The Plan Agent and his agents and professionals may receive such compensation (and reimbursement

---

[8] It is anticipated that the Plan Agent will retain the services of NRF to prosecute any Claim Objections.

for actual out-of-pocket expenses incurred) on a monthly basis without further notice to or action or approval of the Bankruptcy Court.

**6.      Resignation.**

The Plan Agent may resign as such by an instrument in writing signed by the Plan Agent and filed with the Bankruptcy Court, provided that the Plan Agent will continue to serve as Plan Agent after his resignation until the time when appointment of his successor shall become effective.  In addition, any creditor or interest holder has the right to petition the Bankruptcy Court to remove the Plan Agent for cause shown.  In the event of the death, resignation, incompetency, or removal of the Plan Agent by order of the Bankruptcy Court, the Bankruptcy Court following a hearing may appoint a successor Plan Agent.  Every successor Plan Agent appointed shall execute, acknowledge and deliver to the Bankruptcy Court and the retiring Plan Agent an instrument accepting such appointment, and thereupon such successor Plan Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers and duties of the retiring Plan Agent.

**7.      Reporting Duties.**

Forty-five (45) days after the end of each calendar quarter following confirmation, the Plan Agent will file with the Court an unaudited written report and account showing (i) the assets and liabilities at the end of such quarter or upon termination, (ii) any changes in the assets which have not been previously reported, and (iii) any material action taken by the Plan Agent in the performance of his or her duties under the under the Plan that has not been previously reported.

**8.      Termination.**

The Plan Agent shall continue to perform his duties until all Professional Fee Claims, U.S. Trustee quarterly fees, and Plan Agent Expenses have been paid, all proceeds in the Claims Reserve have been distributed to holders of Allowed Claims, and any balance in the Carve Out Escrow has been distributed to the First Lien Agent in accordance with this Plan, at which time the Plan Agent shall file a motion to close the chapter 11 Cases with the Bankruptcy Court.

**9.      The Committee.**

The Committee shall continue in existence until the Effective Date at which time the Committee shall be terminated.  Notwithstanding the Committee's termination after the Effective Date, Gold Weems will, unless otherwise instructed by the Plan Agent, maintain the Carve Out Escrow until (i) all Professional Fee Claims, as ultimately allowed by the Court, and U.S. Trustee fees are paid in full; (ii) all Plan Agent Expenses are paid in full; and (iii) all distributions to holders of Allowed Claims up to the amount of the Claims Reserve are made.  Any amounts remaining in the Carve Out Escrow after payment of the above shall be remitted to the First Lien Agent in accordance with the FDF Energy Services APA and this Plan. In this regard, Gold Weems will charge the Plan Agent for the services of its professionals in making disbursements at its normal rates charged while serving as counsel for the Committee, subject to review and acceptance of such charges by the Plan Agent.

E.   **DISALLOWANCE OF LIABILITIES ASSUMED PURSUANT TO THE FDF ENERGY SERVICES APA**

Upon the Confirmation date, all liabilities specifically assumed pursuant to Section 1.2 of the FDF Energy Services APA (and only up to the aggregate amounts set forth therein) shall be deemed disallowed, expunged, discharged, and void as against the Debtors without need for the filing of a Claim Objection or further order of the Court.  All liabilities specifically assumed pursuant to Section 1.2 of the FDF Energy Services APA (and only up to the aggregate amounts set forth therein) either were paid, or are to be  paid in the ordinary course of business in the manner and to the extent set forth in the FDF Energy Services APA and shall not be Claims against the Debtors, or their Estates.

F.   **CORPORATE NAME CHANGE AND DISSOLUTION OF THE DEBTORS**

The Plan Agent is authorized to take all such actions (and file all necessary pleadings or other documents) as may be required to change the corporate names of the Debtors as provided in the FDF Energy Services APA.  Further, upon the closing of these chapter 11 Cases, the Debtors shall be deemed dissolved and cease to exist.  Notwithstanding the forgoing, the Plan Agent is nonetheless authorized (but not directed) to (a) take any and all such actions (and to file all necessary pleadings or other documents) as may be necessary to formally dissolve the Debtors; and (b) file any final tax returns, applicable certificates of dissolution and/or other applicable documents in the applicable state(s) of incorporation for the Debtors, which may be executed by the Plan Agent without need for approval by the Debtors' officers, directors, or holders of Interests or need for compliance with non-bankruptcy law.

G.   **RESIGNATION OF OFFICERS AND DIRECTORS**

Upon the Effective Date, the directors and officers of the Debtors shall be deemed to have resigned, without further action.  Upon the Effective Date, the Plan Agent shall be empowered and authorized to act on behalf of the Debtors and to take all such actions and measures as necessary to implement the Plan, which actions or measures would otherwise be taken by an officer or a director of the Debtors.

IX.   **QUARTERLY FEES, RESERVES AND DISTRIBUTIONS**

A.   **PAYMENT OF POST-CONFIRMATION QUARTERLY FEES**

The Plan Agent shall continue to report to the U.S. Trustee regarding post-confirmation distributions made by the Estates so that the U.S. Trustee can determine the fees incurred pursuant to 28 U.S.C. §1930(a)(6), and timely pay same until the clerk of the Court closes the Chapter 11 Cases.

B.   **PROVISIONS GOVERNING DISTRIBUTIONS**

1.   **Distributions**.  The Plan Agent will serve without bond and shall make all distributions under the Plan.  Any distributions to be made by the Plan Agent pursuant to the Plan shall be made to the holders of Allowed Claims in accordance with the terms and provisions of Articles VI and VII of this Combined DS/Plan.

To the extent required by applicable law, the Plan Agent shall comply with all tax withholding and reporting requirements imposed on him by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Agent may require any holder of an Allowed Claim entitled to a distribution under the Plan to furnish its, his, or her employer or taxpayer identification number (the "**TIN**") assigned by the Internal Revenue Service. Any distribution under the Plan may be conditioned on the receipt of such TIN. If any such holder of an Allowed Claim entitled to a distribution hereunder fails to provide a requested TIN within thirty (30) days after the request hereof, then such failure shall be deemed to be a waiver of such holder's interest in such distribution, including the right to receive any future distributions. The Plan Agent may but shall not be required to make any distribution of less than $25.00.

2. **Means of Cash Payment**. Payments of cash to be made by the Plan Agent pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

3. **Delivery of Distributions**. Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the Debtors' Schedules and/or proofs of claim filed by such holders (if such proofs of claim have been filed), or at the last known addresses of such holders if no proof of claim is filed; or if the Plan Agent has been notified of a change of address, at the address set forth in such notice.

4. **Time Bar to Cash Payments**. Checks issued by or at the direction of the Plan Agent in respect of Allowed Claims shall be null and void if not cashed within sixty (60) days of the date of delivery thereof. After such date, the Plan Agent shall be entitled to stop payment on such check. Checks issued by or at the direction of the Plan Agent in respect of Allowed Claims that are returned as undeliverable shall be deemed unclaimed property and shall be null and void. Any unclaimed property held on account of such voided or returned checks shall vest back to the Claims Reserve free and clear of all claims and interests and shall be made available for distribution to the other holders of Allowed Claims in accordance with the Plan.

5. **Setoffs**. The Plan Agent may, but shall not be required to, set off against any Claim (and the payments or other distributions to be made pursuant to the Plan in respect of such Claim) of any nature whatsoever that the Debtors many have had against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Agent of any such Claim that the Plan Agent has or may have against such Holder.

C. **PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS AGAINST THE DEBTORS**

1. **Objection Deadline**. Unless a different date is set by order of the Bankruptcy Court, all Claim Objections shall be served and filed no later than ninety (90) days

after the Effective Date or twenty (20) days after a particular proof of Claim is filed, whichever is later; provided, however that such deadline may be extended pursuant to a motion filed with the Court by the Plan Agent.  Any proof of Claim filed after the Bar Date shall be of no force and effect, shall be deemed disallowed and expunged, and will not require objection.  All contested Claims shall be litigated to Final Order, *provided, however*, that the Plan Agent may compromise and settle any contested Claim as described in Articles XI of the Plan.

2.    **Responsibility for Objecting to Claims**.  Until the Effective Date, all parties identified by the Bankruptcy Rules may file objections to Claims.  From the Effective Date and beyond, the Plan Agent shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to claims, including without limitation, any objections to claims filed by the Debtors prior to the Effective Date.

3.    **No Distribution Pending Resolution of Claims**.  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Claim until all such Claims become Allowed Claims.

## X.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The occurrence of each of the following events shall be a separate condition to the Effective Date, which conditions may be waived, in whole or in part, by the Plan Proponents.

## A.    ENTRY OF CONFIRMATION ORDER

The Confirmation Order shall have been signed by the Court and duly entered on the Court's docket in form and substance acceptable to the Plan Proponents, and shall include, among other things, findings of fact and/or conclusions of law that:

1.    approve the terms of the Plan, as it may be amended or modified, and all other agreements contemplated by the Plan;

2.    reserve the jurisdiction of the Bankruptcy Court in accordance with Article XIV below; and

3.    provide, pursuant to § 1125(e), that persons who have solicited acceptances or rejections of the Plan have acted in good faith and in compliance with the provisions, and are not liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## B.    FINALITY OF CONFIRMATION ORDER; WAIVER

The Confirmation Order, in form and substance satisfactory to the Plan Proponents, shall either have become a Final Order, or such condition shall have been waived by an order of the Bankruptcy Court.

C.      **THE CLAIMS RESERVE**

The Claims Reserve to be established under the Plan has been funded in accordance with the Plan.

## XI.     PRESERVATION OF RETAINED CLAIMS AND VESTING

*Vesting*.  The Estates shall remain open after confirmation of the Plan (a) to permit the Plan Agent to prosecute to conclusion any and all Claim Objections, and (b) to make final distributions to all holders of Allowed Claims as provided for in this Plan, including the Professional Fee Claims, U.S. Trustee fees, and Plan Agent Expenses through the closing of these Cases.  However, it is anticipated that the Plan Agent will move for and obtain a Final Decree closing the bankruptcy cases before September 31, 2019.

*Retention of Causes of Action.*  As provided in the FDF Energy Services APA, FDF Energy Services purchased (a) all claims and causes of action against third parties in any way relating to the Purchased Assets (as defined therein); (b) all Avoidance Actions; and (c) all claims and causes of action against any past or present director and/or officer of the Debtors.  As a result, the Debtors' Estates only own and are preserving and retaining hereunder all claims, counterclaims, defenses (including setoff, recoupment and all other defenses of the Estates under§ 558), and causes of action—whether concerning legal, equitable, declaratory, or injunctive relief—that they have or may have against any person or entity relating to any Excluded Asset (as defined in the FDF Energy Services APA), and any other claims or causes of action that are defensive in nature in respect of any proofs of claim that have been filed against the Debtors' Estates and specifically exclude the claims purchased under Section 1.1 of the FDF Energy Services APA.  The Debtors also specifically retain any right to recovery arising out of or otherwise related to that certain Class Action Complaint, Case No. 1:19-cv-10000-UNJ filed in the U.S. Court of Federal Claims, subject to the terms and conditions of the FDF Energy Services APA.  All of the forgoing shall be collectively referred to as the "**Retained Claims**".

All such Retained Claims shall be retained by the Debtors' Estates (subject to the terms of the FDF Energy Services APA) and may be prosecuted and/or asserted by the Plan Agent after the Effective Date.  The Court shall have the jurisdiction to hear such Retained Claims.

***Prosecution and Settlement of Claim Objections***.  After the Confirmation Date, the Plan Agent shall be authorized to commence or continue any suit or other proceeding for the enforcement of any Retained Claim which the Debtors had or had power to assert immediately prior to the Effective Date. The Plan Agent may also, pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code, settle and compromise any and all Retained Claims and any Claim Objections (including without limitation executing any necessary documents, stipulations and/or releases) without further motion or application to the Court.

## XII.    TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

Under § 365, the Debtors had the right, subject to Bankruptcy Court approval, to assume or reject any executory contracts or unexpired leases.  Pursuant to the sale transaction with FDF Energy Services and the resulting Sale Order that was previously entered in these Cases, all

executory contracts and unexpired leases of the Debtors that were not assumed and assigned to FDF Energy Services were "deemed rejected as of [December 28, 2018]." *See* ECF No. 285 at ¶ BB. As such, there are no additional executory contracts or unexpired leases that need to be rejected under the Plan.

All such previously rejected executory contracts and unexpired leases shall be treated as if such contracts/leases had been breached on the date immediately preceding the Petition Date, and such counterparty—to the extent asserted in a timely filed proof of claim—shall be classified as a Class 3 Unassumed General Unsecured Claim for damages incurred as a result of the rejection. To the extent that such rejection damage claim was not asserted in a timely filed proof of claim, such Claim will be forever barred and unenforceable against the Debtors' Bankruptcy Estates.

## XIII.   MODIFICATIONS AND AMENDMENTS

The Plan Proponents may alter, amend, or modify the Plan or any exhibits thereto under § 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to the Effective Date, the Plan Proponents may, under § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims or Interests under the Plan; provided, however that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## XIV.   RETENTION OF JURISDICTION

Under 11 U.S.C. §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and passage of the Consummation Date, the Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.   Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim or Priority Claim or the resolution of any objections to the allowance or priority of Claims or Interests;

B.   Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, including, if necessary, the liquidation or allowance of any Claims arising therefrom;

C.   Effectuate performance of and payments under the provisions of the Plan;

D.   Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

E.      Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

F.      Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

G.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

H.      Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

I.      Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

J.      Hear and determine all adversary proceedings, contested matters, and related matters filed by or on behalf of the Plan Agent, including any Claim Objections, to the extent provided for by applicable law;

K.      Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtors' Cases;

L.      Hear and determine matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146;

M.      Hear and determine all matters related to the property of the Debtors' Estates from and after the Consummation Date;

N.      Hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

O.      Enter a final decree(s) closing the Debtors' Cases.

## XV.    EFFECTS OF CONFIRMATION

## A.    BINDING EFFECT

The Plan shall be binding upon all present and former holders of Claims and Interests and their respective successors and assigns.  To opt-out of the release and exculpation provisions below, Holders of Claims must file an objection with the Court specifically stating your intention

to opt-out by the deadline set by the Court for filing and serving objections to approval of the Plan and Disclosure Statement.

**B.      RELEASES BY HOLDERS OF CLAIMS AND INTERESTS**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and each Released Party from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, causes of action, and liabilities of any kind, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts (including any orders entered in connection therewith), the formulation, preparation, dissemination, negotiation, or filing of this Combined DS/Plan, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, indebtedness under which any Debtor is or was a borrower or guarantor, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, the foregoing releases shall not release claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

**C.      EXCULPATION AND LIMITATION OF LIABILITY**

1.      Neither the Debtors' Estates, the Debtors, the Plan Proponents, the First Lien Secured Parties, the Subordinated Lender nor the Plan Agent will have or incur any liability to any holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the solicitation of votes to accept the Plan, the Debtors' Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their fraud, gross negligence, or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

2.      No holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the Debtors' Estates, the Debtors, the Plan Proponents, the First Lien Secured Parties, the Subordinated Lender or the Plan Agent, for any act or omission in connection with, relating to, or arising out of the solicitation of votes to accept the Plan, or the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except as provided by the Plan or by law.

## D.    LIMITED DISCHARGE OF DEBTORS AND INJUNCTION

This is a liquidating Plan, and the Debtors do not intend to engage in operations after confirmation of the Plan.  Notwithstanding the forgoing, the entry of the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings, if any, against the Debtors and their assets and properties and any proceedings not yet instituted against the Debtors or their assets and properties, except as otherwise provided in the Plan or the Confirmation Order. Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims against the Debtors are permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or their Estates, or the Plan Agent, with respect to any such Claim, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any such Claim against the Debtors, their Estates, or the Plan Agent, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, or their Estates, or the Plan Agent, with respect to such Claim, (d) asserting any right of subrogation of any kind against any obligation due to the Debtors, their Estates, or the Plan Agent, with respect to any such Claim and (e) asserting any right of setoff or recoupment against the Debtors, their Estates or the Plan Agent except as specifically permitted by § 553 of the Bankruptcy Code.  Unless otherwise provided in the Plan or the Confirmation Order, or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in these cases pursuant to § 105, if any, or § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date.

## E.    COMPROMISE AND SETTLEMENT

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## XVI.   MISCELLANEOUS PROVISIONS

*Severability of Plan Provisions*.  If, prior to confirmation, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court, at the request of a party in interest, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation,

the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*Successors and Assigns.* The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

*Consummation of Plan.* The Confirmation Order shall include (a) a finding by the Bankruptcy Court that FED. R. CIV. P. 62(a) shall not apply to the Confirmation Order; and (b) the Bankruptcy Court's authorization for the Plan Proponents to consummate the Plan immediately after entry of the Confirmation Order.

*Governing Law.* Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (i) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and (ii) corporate governance matters shall be governed by the laws of the state of incorporation, without giving effect to the principles of conflicts of law thereof.

## XVII.  CONFIRMATION OF THE PLAN

### A.    VOTING PROCEDURES AND REQUIREMENTS

The Plan Proponents are providing copies of this Combined DS/Plan and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims against the Debtors that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan. Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan. In addition, Classes of Claims or Interests that are not entitled to a distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the Plan, holders of Claims in Classes 2A, 2B, 2C 3, 4A, and 4B are, or may be determined to be, Impaired and are entitled to vote. Class 1 is not Impaired and is deemed to have accepted the Plan. Classes 5 and 6 are Impaired and deemed to reject the Plan. Holders of Claims in Classes 2C and 3 must state on their ballots, under penalty of perjury, that they hold Unassumed Claims. Holders of Claims in Classes 2C and 3 that do not return their ballots or do not indicate whether their Claims are Unassumed Claims will not be counted.

The following voting procedures (the "**Voting Procedures**") have been established with respect to the amount and classification of Claims and Interests, and the determination of the validity of Ballots submitted, for voting purposes:

Unless otherwise provided below, a claim will be deemed temporarily allowed for voting purposes in an amount equal to (i) if a timely filed proof of claim has not been filed, the amount of such claim as set forth in the schedules of assets and liabilities, filed by the Debtors or (ii) the amount of such claim as set forth in a timely filed proof of claim.

If a claim is deemed allowed in accordance with the Plan, such claim will be allowed for voting purposes in the deemed allowed amount set forth in the Plan.

If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court.

Ballots that are otherwise validly executed but do not indicate either acceptance or rejection of the Plan will not be counted.

Only Ballots that are timely received with signatures will be counted.  Unsigned ballots will not be counted.

Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will be counted.

Ballots that are illegible, or contain insufficient information to permit the identification of the creditor, will not be counted.

If a creditor simultaneously casts inconsistent duplicate ballots, with respect to the same claim, such ballots shall not be counted.

Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Bankruptcy Court at the Confirmation Hearing.

**IN ORDER TO BE COUNTED, EXCEPT TO THE EXTENT THE DEBTOR SO DETERMINES OR AS PERMITTED BY THE BANKRUPTCY COURT PURSUANT TO BANKRUPTCY RULE 3018, BALLOTS MUST BE SIGNED AND RETURNED SO THAT THEY ARE RECEIVED NO LATER THAN 11:59 P.M. (CENTRAL), ON JUNE [●], 2019 AT THE FOLLOWING ADDRESS:**

Francis' Drilling Fluids, Ltd., et al. Ballot Processing
c/o Stretto
8269 E. 23rd Avenue, Suite 275
Denver, CO 80238
Email: TeamFrancisDrilling@stretto.com
Fax: 720-930-4881
Phone: 855-812-6112

CLAIMS AND NOTICING AGENT FOR THE DEBTORS

**BALLOTS WILL BE ACCEPTED BY REGULAR MAIL, FACSIMILE OR EMAIL.**

As mentioned above, if your Ballot is not signed and returned as described, it will not be counted.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by addressing a written request to Debtors' counsel indicated below by regular mail, facsimile or email.  Please follow the directions contained on the Ballot carefully.

The process of soliciting acceptance of the Plan must be fair and open without outside influence in the form of representations, inducements or duress of any kind.  To the extent that you believe solicitation of your vote from any party is being sought outside of the judicially-approved and statutorily-defined disclosure requirements and Voting Procedures, please contact counsel for the Debtors.

**B.      ACCEPTANCE**

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions hereinafter discussed below. Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are Unimpaired under the Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Claims or Interests of Impaired Classes.

The Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject the Plan, are counted.

**C.      ACCEPTANCE OR REJECTION OF THE PLAN**

*Classes Entitled to Vote.*  Each Impaired Class of Claims or Interests that will (or may) receive or retain property or any interest in property under the Plan shall be entitled to vote to accept or reject the Plan.  Ballots shall be cast and tabulated with respect to Claims against and Interests in the Debtors' Bankruptcy Estates.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.  Class 1 is not Impaired and deemed to have accepted the Plan.  Classes 2A, 2B, 2C, 3, 4A, and 4B are Impaired and entitled to vote.  Classes 5 and 6 are Impaired and deemed to reject the Plan.

*Acceptance or Rejection by Impaired Classes.*  An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under § 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan; and (ii) the holders (other than any holder designated under § 1126(e)) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  A Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Interests of such Class do not entitle the holders of Claims or Interests in such Class to receive or retain any property under the Plan on account of such Claim or Interest.

-35-

*Cramdown.*  The Debtors will request Confirmation of the Plan, as it may be modified from time to time, under § 1129(b) ("**Cramdown**").

## D.    CONFIRMATION OF THE PLAN

To confirm the Plan, § 1129 requires the Bankruptcy Court to make a series of determinations concerning the Plan, including, without limitation: (i) that the Plan has classified Claims and Interests in a permissible manner; (ii) that the contents of the Plan complies with the technical requirements of the Bankruptcy Code; (iii) that the Plan Proponents have proposed the Plan in good faith; and (iv) that the Plan Proponents have made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan and the Debtors' Cases.  The Plan Proponents believe that all of these conditions have been or will be met with respect to the Plan.

The Bankruptcy Code requires that, unless the Cramdown provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes. Therefore, the Bankruptcy Court must find, in order to confirm the Plan, that the Plan has been duly accepted.  In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interests" of all holders of Claims and Interests.  Thus, even if holders of Claims were to accept the Plan by the requisite number of votes, the Bankruptcy Court is still required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of holders of Claims and Interests before it can confirm the Plan.

## E.    THE BEST INTERESTS TEST & LIQUIDATION ANALYSIS

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan the Bankruptcy Court must independently determine, pursuant to § 1129(a)(7), that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan.  This requirement is satisfied if the Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtor under Chapter 7. This requirement is commonly referred to as the "Best Interests of Creditors Test." This Plan satisfies the test.

Here, the Plan provides the possibility for a greater recovery to the creditors than such creditors would receive under a liquidation pursuant to chapter 7 as the Debtors' Estates, in a chapter 7 scenario, would be burdened with an additional layer of administrative expense associated with the appointment of a chapter 7 trustee, and retention of professionals attendant thereto.  The Plan thus increases the efficiency of administering the remaining assets (i.e., the Claims Reserve) for the benefit of the Debtors' creditors by ensuring that holders of Allowed Claims receive the entire $30,000.00 that will be set aside in the Claims Reserve on a pro rata basis rather than having such amount diminished by chapter 7 administrative fees and expenses.

Additionally, in chapter 7 cases, the chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors, due

-36-

to the sale of substantially all of their assets, have already liquidated their assets, have collected the proceeds thereof, and have already incurred many of the expenses associated with the foregoing.  Accordingly, the Plan Proponents believe that there is a reasonable likelihood in a chapter 7 scenario that holders of Allowed Claims would have to pay doubly for the funds accumulated in the Estates, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed.

It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to holders of Allowed Claims.  Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the case to chapter 7.  Thus, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Cases.

In short, the Plan presents a better alternative to a chapter 7 liquidation.  Creditors' potential recoveries under the Plan is not expected to be less than what could be obtained in a hypothetical chapter 7 liquidation.  For additional information see the Liquidation Analysis attached as **Exhibit 1** to this Combined Plan/DS.

**IMPORTANTLY, THE PLAN PROPONENTS, WHICH INCLUDES THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO ACCEPT THE PLAN AS CONTAINED HEREIN.**

Based on the foregoing, the Plan provides an opportunity to bring the greatest return to creditors.

## F.    FEASIBILITY

The Plan is a liquidating plan, and the proceeds from the Claims Reserve shall be distributed to satisfy the Allowed Claims of creditors to the extent possible.

## XVIII.    DISCLAIMERS

*The Plan Proponents Have No Duty to Update*.  The statements contained in this DS/Plan are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this DS/Plan after that date does not imply that there has been no change in the information set forth herein since that date.  The Plan Proponents have no duty to update this DS/Plan unless otherwise ordered to do so by the Bankruptcy Court.

*Source of Information*.  Counsel for the Committee has relied on pleadings filed in the Bankruptcy Cases and Counsel for Debtors have relied upon information provided by the Debtors in connection with the preparation of this DS/Plan.  Although counsel has performed certain limited due diligence in connection with preparing this DS/Plan, no independent verification of the information contained herein has been performed.

*No Legal or Tax Advice Provided*.  The contents of this DS/Plan should not be construed as legal, business or tax advice.  Each creditor or holder of an Interest should consult his, her, or

its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

*This DS/Plan is Not Legal Advice to You*.  This DS/Plan may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

*No Admission Made*.  Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Plan Proponents) or be deemed evidence of the tax or other legal effects of the Plan on the Plan Proponents or on holders of Claims or Interests.

*No Regulatory Agency Approval*.  No governmental or other regulatory agency approvals have been obtained as of the date of the mailing of this DS/Plan.

## XIX.   CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests.  The Plan Proponents therefore urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be received by the Voting Deadline.

Dated:  May 10, 2019.

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Jason L. Boland*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 20492434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

**-**and-

**GOLD, WEEMS, BRUSER, SUES & RUNDELL**

**(A Professional Law Corporation)**

By: */s/ Bradley L. Drell*
Bradley L. Drell (La. Bar Roll #24387)
P. O. Box 6118
Alexandria, Louisiana 71307-6118
Telephone:  (318) 445-6471
Facsimile:  (318) 445-6476

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

-39-